# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GERVEL O. PALENCIA-ORELLANA,

       Plaintiff,

v.                                   CIV 19-0563 KBM

ANDREW M. SAUL,
Commissioner of Social
Security Administration,

       Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff's Motion to Reverse and/or Remand (*Doc. 19*) filed on November 12, 2019. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *See Docs. 9*; *11*; *13*. Having considered the record, submissions of counsel, and relevant law, the Court finds Plaintiff's motion is not well-taken and will be denied.

## I.    Procedural History

On August 4, 2015, Mr. Gervel O. Palencia-Osrellana ("Plaintiff") filed applications with the Social Security Administration for a period of disability and Disability Insurance Benefits under Title II of the Social Security Act ("SSA"), and for Supplemental Security Income under Title XVI of the SSA. Administrative Record[1] (AR)

---

[1] Documents 16-1 through 16-44 contain the sealed Administrative Record. *See Doc. 16.* The Court cites the Administrative Record's internal pagination, rather than the CM/ECF document number and page.

at 145, 146, 185-86, 290-96, 299-300. Plaintiff alleged a disability onset date of June 12, 2013. AR at 299.

The present applications are not Plaintiff's first. Previously, in March of 2012, Plaintiff filed an application for disability insurance benefits, alleging disability beginning December 24, 2009. AR at 97. On consideration of this previous application, ALJ Christa Zamora determined, on September 4, 2015, that Plaintiff "was under a disability, as defined by the [SSA], from December 24, 2009 through June 12, 2013," with his "disability end[ing] June 13, 2013." AR 106-08 (citing 20 C.F.R. § 404.1520(g)).

The application before the Court here alleges a disability beginning the day after the closed period of disability for which Plaintiff was previously granted disability insurance benefits. Disability Determination Services determined that Plaintiff was not disabled both initially (AR at 145-46) and on reconsideration (AR at 185-86). Plaintiff requested a hearing with an Administrative Law Judge ("ALJ") on the merits of his applications. AR at 187.

At a March 13, 2018 hearing before ALJ Michael Leppala,[2] Plaintiff was represented by counsel, Lucia Misa-O'Connor. AR at 49-82. Both Plaintiff and a vocational expert testified, and a Spanish language interpreter interpreted for Plaintiff. *See* AR at 27, 49-82. ALJ Leppala issued an unfavorable decision on September 19, 2018. AR at 27-40. Plaintiff submitted a Request for Review of Hearing Decision/Order to the Appeals Council (AR at 286-88), which the Council denied on May 9, 2019 (AR at

---

[2] While the September 19, 2018 decision is signed by ALJ "Michael Leppala," the hearing transcript refers to the presiding ALJ at the hearing as "Michael Lovelion." *Compare* AR at 47-82, *with* AR at 27-40. Presumably, the transcript simply misstates the name of the presiding ALJ.

1-3). Consequently, the ALJ's decision became the final decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## II. Applicable Law and the ALJ's Findings

A claimant seeking disability benefits must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). The Commissioner must use a sequential evaluation process to determine eligibility for benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

The claimant has the burden at the first four steps of the process to show: (1) he is not engaged in "substantial gainful activity"; (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and (3) his impairment(s) meet or equal one of the listings in Appendix 1, Subpart P of 20 C.F.R. Pt. 404; or (4) pursuant to the assessment of his residual functional capacity (RFC), he is unable to perform his past relevant work. 20 C.F.R §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (citations omitted). "RFC is a multidimensional description of the work-related abilities [a claimant] retain[s] in spite of [his] medical impairments." *Ryan v. Colvin*, Civ. 15-0740 KBM, 2016 WL 8230660, at *2 (D.N.M. Sept. 29, 2016) (citing 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(B); 20 C.F.R. § 404.1545(a)(1)). If the claimant meets "the burden of establishing a prima facie case

of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" Plaintiff retains sufficient RFC "to perform work in the national economy, given his age, education, and work experience." *Grogan*, 399 F.3d at 1261 (citing *Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988)); *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

At Step One of the process,[3] ALJ Leppala found that Plaintiff "ha[d] not engaged in substantial gainful activity since June 13, 2013, the alleged onset date." AR at 30 (citing 20 C.F.R. §§ 404.1571-1576, 416.971-976). At Step Two, the ALJ concluded that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine, osteoarthritis and degenerative joint disease of the right knee, status-post multiple knee surgeries and a total knee replacement, obesity, depressive disorder, generalized anxiety disorder, somatic symptom disorder, posttraumatic stress disorder, and alcohol and opioid dependence." AR at 30 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The ALJ also found that Plaintiff had the following non-severe impairments: "obstructive sleep apnea, hypertension, gastroesophageal reflux disease (GERD), and chronic right ear dysfunction and hearing loss." AR at 30.

At Step Three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." AR at 30 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). At Step Four, the ALJ considered the evidence of record and found that Plaintiff:

---

[3] ALJ Leppala first found that Plaintiff "me[t] the insured status requirements of the Social Security Act through December 31, 2017." AR at 30.

> [h]as the residual functional capacity to perform light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b). He can lift and/or carry twenty pounds occasionally and ten pounds frequently. He can stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday, all with normal breaks. He can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but he can never climb ladders, ropes, or scaffolds. The Claimant can understand, carry out, and remember simple instructions and make commensurate work-related decisions. He can respond appropriately to supervision, coworkers, and work situations; deal with routine changes in a work setting; and maintain concentration, persistence, and pace for up to, and including, two hours at a time with normal breaks, throughout a normal workday. The Claimant is limited to occasional, superficial interactions with coworkers, supervisors, and the public.

AR at 33. Based on this RFC, ALJ Leppala found that Plaintiff "is unable to perform any past relevant work." AR at 38 (citing 20 C.F.R. §§ 404.1565, 416.965). Yet, the ALJ also found that Plaintiff can perform the jobs of Bottling Line Attendant (DOT 920.687-042) and Bakery Helper (DOT 524.687-022). ALJ at 40. Consequently, the ALJ ultimately determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 13, 2013, through the date of [the ALJ's] decision." AR at 40 (citing 20 C.F.R. §§ 404.1520(g), 416.920(g)).

## III. Legal Standard

The Court must "review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161, 1166 (10th Cir. 2012) (citation omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax*, 489

F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1172). "It requires more than a scintilla, but less than a preponderance." *Id.* (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). The Court will "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Id.* (quoting *Hackett*, 395 F.3d at 1172 (quotation marks omitted)).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200). The Court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zoltanski*, 372 F.3d at 1200).

## IV. Discussion

Plaintiff raises four issues in his motion. He argues that the ALJ (1) "failed to consider the opinions of clinical psychologist, Dr. Betty Davis, without explanation and failed to consider the same in evaluating [his] symptoms"; (2) "fail[ed] to incorporate hearing loss into the RFC[, which he submits] is contrary to the substantial evidence and reflects a failure to consider [his] testimony"; (3) "did not meaningfully explain how he incorporated the impact of obesity into the RFC"; and (4) "failed to consider Plaintiff's good work history to bolster his credibility." *Doc. 19* at 21-26. For the reasons that follow, the Court rejects each of Plaintiff's arguments and affirms the ALJ's decision.

**A. The ALJ did not commit reversible error in his consideration of Dr. Davis's opinions.**

The Court begins with the premise that the ALJ must evaluate every medical opinion in the record. *See* 20 C.F.R. §§ 404.1527(c); 416.927(c). Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1); 416.927(a)(1). In weighing a medical opinion, the ALJ considers several factors, including the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c); 416.927(c). While "[t]he record must demonstrate that the ALJ considered all of the evidence," there is no requirement that the ALJ "discuss every piece of evidence." *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)). "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1010. The ALJ must "provide specific, legitimate reasons[] if he decide[s] to discount or dismiss an opinion from an acceptable medical source, and to explain the weight given to opinions from [other medical] sources . . . ." *See Harrold v. Berryhill*, 714 F. App'x 861, 865 (10th Cir. 2017) (quotation marks and citations omitted). Ultimately, the ALJ must "ensure that the discussion of the evidence in the determination or decision allows

a claimant or subsequent reviewer to follow [his] reasoning, when such opinions may have an effect on the outcome of the case." *Id.* (quotation and citation omitted).

Plaintiff alleges that ALJ Leppala erred by failing to consider and discuss the opinions of Betsy J. Davis, Ph.D., a clinical psychologist. *Doc. 24* at 1. He maintains that "[h]ad Dr. Davis's opinions been fairly considered, the ALJ may have found Plaintiff limited to sedentary work or less." *Doc. 19* at 22. Plaintiff goes on to explain that, given his age, education, and work experience, even a limitation to sedentary work would render him disabled as a matter of law. *Doc. 24* at 7 (citing Appendix 2, Subpart P of 20 C.F.R. Pt. 404). Plaintiff insists that the ALJ's failure to discuss Dr. Davis's opinions "eliminates the possibility of meaningful review" by the Court and requires reversal. *Doc. 19* at 22-23. Plaintiff identifies the following opinions in Dr. Davis's report:

a. Fear of worsening his pain may be contributing to decreased activity [by Plaintiff], thus increasing physical deconditioning which in turn would increase pain.
b. [Plaintiff] may be caught in a vicious cycle where depression and lack of energy and motivation have resulted in a decrease in daily activities, further contributing to deconditioning and increased pain and depression.
c. [Plaintiff] is also continuing to experience intrusive memories of the accident that trigger his sympathetic nervous system into a state of extreme hyperarousal.
d. His depression and lack of concentration are so severe that he would be unable to engage in my treatment protocol in his current state.

*Doc. 24* at 2 (footnotes omitted).

The Commissioner argues that the ALJ was under no duty to weigh these statements by Dr. Davis, however, because Dr. Davis did "not identify any functional limitations that would have assisted the ALJ's [sic] in assessing Plaintiff's residual functional capacity." *Doc. 23* at 6. Plaintiff, in contrast, insists that Dr. Davis's "opinions

could reasonably have been construed by the ALJ as imposing vocationally relevant limitations." *Doc. 24* at 3. Given these conflicting interpretations, careful consideration of Dr. Davis's report and the nature of her opinions is warranted.

Dr. Davis performed a psychological evaluation of Plaintiff in January 2018 in order to "ascertain the impact of [his December 24, 2009 work] injury on [his] life." AR at 1015. The assessment included a diagnostic clinical interview, medical records review, and the administration of three psychometric tests. AR at 1015. In her evaluation, Dr. Davis recorded Plaintiff's own accounts of his symptoms of depression, which included complaints of "depressed moods and feelings of helplessness, hopelessness, worthlessness, and guilt[,] . . . [as well as] disrupted sleep, problems with concentration/memory, frequent crying spells, . . . decreased energy level[,] . . . irritability, frustration, and anger." AR at 1015. Similarly, she recorded Plaintiff's accounts of the symptoms of his PTSD, which included mood and cognition alterations, feelings of detachment, irritability, angry outbursts, hypervigilance, poor concentration, and exaggerated startle response. AR at 1015-16.

In contrast, Dr. Davis also observed that Plaintiff's cognitive status was normal. AR at 1016. Specifically, she found his attention, concentration, memory, thought processes, and speech all within normal limits. AR at 1016. Notwithstanding these normal findings, she diagnosed Plaintiff with Somatic Symptom Disorder with Predominant Pain,[4] Major Depressive Disorder, and PTSD. AR at 1017. She explained

---

[4] Somatic System Disorder "is a form of mental illness that causes one or more bodily symptoms, including pain. The symptoms may or may not be traceable to a physical cause including general medical conditions, other mental illnesses, or substance abuse. But regardless, they cause excessive and disproportionate levels of distress." Somatic Symptom and Related Disorders,

that "all three disorders are causally related to [Plaintiff's] work injury of 12/24/09." AR at 1017.

Following administration of three psychometric tests, Dr. Davis also explained that the results revealed "a severe level of self-reported depression" on the Beck Depression Inventory, "a high level of self-reported anxiety" on the State-Trait Anxiety Inventory, and an "extremely high" score on the Catastrophizing Scale of Coping Strategies Questionnaire. AR at 1016-17. As noted by Plaintiff, Dr. Davis surmised that Plaintiff "may be caught in a vicious cycle where the somatic focus and catastrophic thinking are contributing to anxiety and stress, which in turn would increase the pain." AR at 1017. Dr. Davis described this cycle further, noting that "[f]ear of worsening his pain may be contributing to [Plaintiff's] decreased activity, thus increasing physical deconditioning, which in turn would increase pain[,]" and "depression and lack of energy and motivation [may] have resulted in a decrease in daily activities, further contributing to deconditioning and increased pain and depression." AR at 1017. Given these impressions, Dr. Davis opined as follows:

> [Plaintiff] is not a candidate for psychological treatment until he is prescribed an anti-depressant and start[s] to show some improvement with concentration and energy. His depression and lack of concentration are so severe that he would be unable to engage in my treatment protocol in his current state. After he has shown some improvement with medication, I would recommend he begin treatment.

AR at 1017.

---

https://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment#1 (last visited Mar. 30, 2020).

Although the ALJ's decision does not refer to Dr. Davis by name, it nevertheless confirms that the ALJ considered Dr. Davis's report and the opinions therein. First, the ALJ recounted findings from Dr. Davis's report in his decision, explaining that "[i]n October 2017 and early 2018, [Plaintiff] exhibited normal behavior, thought, mood, affect, orientation, memory, attention, concentration and judgment" but was diagnosed with "major depressive disorder, somatic symptom disorder, and posttraumatic stress disorder." AR at 36 (citing AR at 1016-17). These findings comport with those contained in Dr. Davis's January 2018 report. *Compare* AR at 36, *with* AR at 1016-17. Further, the ALJ referenced Dr. Davis's normal cognitive status findings at least six times in his decision. *See*, *e.g.*, AR at 32-37 (citing AR at 1016-17 throughout). Given the ALJ's repeated and direct references to Dr. Davis's report and to findings therein, the Court cannot agree with Plaintiff that the ALJ neglected to consider it.

Moreover, the Court concludes that the ALJ's failure to explicitly discuss certain conclusions and recommendations by Dr. Davis does not constitute reversible error. Two Tenth Circuit cases, *Watts v. Berryhill*, 705 F. App'x 759 (10th Cir. 2017) and *Duncan v. Colvin*, 608 F. App'x 566 (10th Cir. 2015), provide helpful guidance in reaching this determination. First, in *Watts*, the Tenth Circuit observed that the ALJ failed to "discuss in any detail the evidence from [the claimant's] treating physicians" but *did* acknowledge her "lengthy history of treatment for bipolar disorder, depression, and anxiety." *Watts*, 705 F. App'x at 761. When the ALJ "stated he had considered all of the medical evidence in the record, including reported symptoms, objective medical evidence, and medical opinion evidence," the court explained that it took him "at his word." *Id.* at 761-62. The ALJ did discuss the rejection of two opinions from the

claimant's medical providers in *Watts*. First, he explained that he gave "very little weight" to the medical sources' GAF scores, because "they vary daily and represent only a clinician's subjective evaluation at a single point in time." *Id.* at 762. Second, he reasoned that a medical provider's opinion that the claimant was unable to work was entitled to "no weight[,] because findings of disability are reserved to the Commissioner." *Id.* The Tenth Circuit determined that the ALJ's limited discussion of the claimant's medical providers' evidence sufficed, explaining:

> None of [the claimant's] treating physicians expressed any medical opinion that she had greater functional limitations than those identified by the ALJ in his RFC determination. We have held an ALJ may permissibly engage in a less extensive analysis of the medical evidence where "none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform . . . work."

*Id.* (citing *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004)).

Turning to the instant case, the Court observes that Dr. Davis offered opinions about Plaintiff's cycle of decreased activity and increased pain and depression, about the cause of his hyperarousal, and about his inability to engage in treatment. She did not, however, offer opinions regarding Plaintiff's ability to work, nor did she translate any of her findings into work-related limitations. Thus, following the rationale in *Watts*, a "less extensive analysis" of Dr. Davis's report was required. This begs the question whether the ALJ's limited reference to Dr. Davis's report, primarily to her findings of normal cognitive functioning, warrants remand.

The Tenth Circuit's rationale in *Duncan* helps the Court to answer this question. In *Duncan*, the ALJ was largely silent as to the weight he gave the opinions of the claimant's orthopedic surgeon. 608 F. App'x at 574. The surgeon diagnosed the claimant with

various impairments, and because the ALJ characterized each of those diagnosed impairments as severe, the court reasoned that the ALJ had not rejected them. *Id.* Holding that the ALJ had not committed reversible error in his weighing of the orthopedic surgeon's opinions, the court explained that because "there were no medical opinions regarding [the claimant's] work-related functional limitations, there was no opinion on such matters by [the surgeon] for the ALJ to weigh." *Id.*

As noted above, Dr. Davis diagnosed Plaintiff with Somatic Symptom Disorder, Major Depressive Disorder, and PTSD. AR at 1017. As in *Duncan*, the ALJ determined that each of these impairments was severe at step two of the sequential evaluation process. AR at 30. Thus, Plaintiff cannot show that the ALJ neglected to consider Dr. Davis's diagnoses, even if he did not directly attribute them to Dr. Davis. Further, Plaintiff does not identify any work-related functional limitations opined by Dr. Davis. At most, he argues that Dr. Davis's "opinions could reasonably have been construed by the ALJ as imposing vocationally relevant limitations." *Doc. 24* at 3. Even if it would have been reasonable for the Court to construe Dr. Davis's opinions in this manner, this is not the proper inquiry. The Court must, instead, consider whether substantial evidence supports the ALJ's findings and whether the ALJ applied the correct legal standards. *Lax*, 489 F.3d at 1084. In doing so, the Court must refrain from reweighing the evidence. *See id.* Given the absence of work-related functional limitations in Dr. Davis's report, the Court cannot find that the ALJ committed reversible error by failing to articulate the weight assigned to any statements or opinions in her report. *See Duncan*, 608 F. App'x at 574.

Plaintiff submits that *Watts* and *Duncan* are distinguishable because the ALJs in those cases, unlike the ALJ here, mentioned and considered the subject medical sources'

opinions in their decisions. *Doc. 24* at 3 (citing *Duncan*, 608 F. App'x at 578-79). While the Tenth Circuit did acknowledge some weighing of the subject opinions by the ALJs in *Watts* and *Duncan*, it ultimately reasoned that the absence of work-related functional limitation opinions excused a thorough weighing. Applying the same logic here, the Court finds that the opinions identified by Plaintiff in Dr. Davis's report were simply not entitled to a thorough evaluation as such from the ALJ.

Plaintiff advances a related argument concerning the ALJ's failure to discuss Dr. Davis's psychometric test results. He submits that the ALJ's failure to consider the results of these tests negatively affected his assessment of Plaintiff's subjective complaints. *Doc. 19* at 22-23. Although the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." AR at 34. But Plaintiff maintains that if the ALJ had fully considered Dr. Davis's opinions, he "would have found [his subjective] allegations were reasonably supported by the record in light of the psychometric testing demonstrating that [he] abnormally processes, interprets and fears pain such that he is unable to work on a sustained and continuing basis." *Doc. 19* at 22. In sum, Plaintiff contends that Dr. Davis's psychometric testing results bolster his own allegations. The Court disagrees.

Dr. Davis indicated that Plaintiff's scores on psychometric tests revealed high levels of "*self-reported* depression," "*self-reported* anxiety," and "many negative and fearful *thoughts* regarding pain." AR at 1016-17. Although the psychometric test results

are somewhat consistent with Plaintiff's subjective complaints, they do not render those complaints consistent with the other medical evidence of record, nor do they undermine the ALJ's credibility finding. Dr. Davis's emphasis on the "self-reported" severity of Plaintiff's impairments demonstrates that the test results were driven by Plaintiff's subjective complaints. Simply put, Plaintiff fails to demonstrate that Dr. Davis's psychometric test results, if properly considered, would have altered the ALJ's assessment of his subjective complaints.

Plaintiff also contends that proper consideration of Dr. Davis's opinions might have altered the weight he afforded the opinions of Amy DeBernardi, Psy.D., a psychological consultative examiner. *Doc. 19* at 23. Plaintiff argues that "[h]ad the ALJ compared Dr. Davis's opinions, findings and rationales to Dr. DeBernardi's, he may have found them consistent and afforded them greater weight resulting in a finding of disability." *Id.* As described by the ALJ, Dr. DeBernardi opined that Plaintiff "could maintain reason and understanding, but would have difficulty sustaining concentration and persistence, tolerating stress, adapting to change, remaining dependable, and forming appropriate relationship[s] with coworkers, supervisors, and the public." AR at 37 (citing AR at 887).

The Court has already determined that Dr. Davis's failure to provide vocationally-relevant limitations rendered her opinions less deserving of thorough analysis and rendered harmless the ALJ's failure to articulate the weight afforded to them. But Dr. DeBernardi's opinions provide arguably more vocational relevance than those of Dr. Davis. Dr. DeBernardi's opinions touch upon Plaintiff's ability to adapt to changes, to

serve as a dependable employee, and to form relationships with coworkers and supervisors. *See* AR at 887.

Even so, the ALJ gave Dr. DeBernardi's opinions "little weight" for at least two reasons. First, he explained that the opinions were "vague and d[id] not specify the degree of [Plaintiff's] limitations or what he could or could not do in a vocational setting." AR at 37. The Court agrees that the opinions lack *specificity* regarding Plaintiff's limitations in a vocational setting. Instead, they suggest that Plaintiff's ability to tolerate stress was "somewhat limited," that his anxiety "would likely impact his ability to tolerate changes in the work environment," and that his depression "would be likely to impact his ability to be a dependable employee or to form appropriate relationships with co-workers, supervisors, or the general public." *See* AR at 887. Even if Dr. DeBernardi's opinions were consistent with those of Dr. Davis, the Court is satisfied that the vagueness and lack of specificity apparent in Dr. DeBernardi's opinions were legitimate reasons for the ALJ to discount them.

Second, the ALJ concluded that "any suggestion that [Plaintiff] could not sustain work activity, from a mental standpoint, is rebutted by his demonstrations of only sporadic deficits to mood and affect and consistently normal orientation, thought, alertness, memory, speech, behavior, insight and judgment." AR at 37 (citing AR at 887). Notably, Dr. Davis's report was among the records the ALJ cited to support this finding. *See* AR at 37 (citing AR at 1016-17). Indeed, the Court concludes that Dr. Davis's normal cognitive status findings provide substantial evidence for the ALJ's

rejection of Dr. DeBernardi's opinions. The Court will resist Plaintiff's invitation to reweigh the opinions of Dr. Davis and Dr. DeBernardi.[5]

For all of these reasons, the Court will deny Plaintiff's motion with regard to his first claim of error.

**B.     The ALJ adequately accounted for Plaintiff's hearing impairments in his RFC assessment.**

Plaintiff argues that the ALJ erred by omitting from his RFC any work-related limitations to account for his alleged hearing loss. *Doc. 19* at 23. Plaintiff testified that hearing loss was one of his disabling impairments, explaining that "with my two ears I can't hear very well." AR at 57. However, the ALJ characterized Plaintiff's hearing loss as a non-severe impairment, one that causes only a minimal effect and did not impair his ability to work. AR at 30 (citing 20 C.F.R. §§ 404.1520(c), 404.1509, 416,920(c), 414.909; SSR 85-28, 1985 WL 56856 (Jan. 1, 1985); SSR 96-3p, 1996 WL 374181 (July 2, 1996)[6]). But all impairments, even those characterized as non-severe, must be included in an RFC assessment if they are supported by substantial evidence. *See Wells v. Colvin*, 727 F.3d 1061, 1068-69 (10th Cir. 2013).

---

[5] Relatedly, Plaintiff contends that if the ALJ had adequately considered the consistency between Dr. Davis and Dr. DeBernardi's opinions, he "would likely have afforded less weight to the state agency psychological consultants' opinions." *Doc 19* at 23. Plaintiff does not, however, develop this argument further. Having determined herein that the ALJ's consideration of Dr. Davis's and Dr. DeBernardi's opinions was proper, the Court rejects Plaintiff's argument concerning the weight the ALJ gave state agency psychologists.

[6] The Court notes that SSR 96-3p, a ruling that addressed a claimant's allegations of pain and other symptoms in the context of determining whether an impairment was severe, was rescinded on June 14, 2018, prior to the ALJ's September 19, 2018 decision. *See* 20 C.F.R. § 402.35(b)(1); SSR 96-3p, 2018 WL 3461816 (June 14, 2018). Nevertheless, neither party has raised an issue related to the ALJ's reliance on this previously rescinded ruling, and the Court will not develop such an argument on a party's behalf.

Here, the ALJ did not include any limitations in Plaintiff's RFC to account for a hearing impairment. Yet, he did not leave the hearing impairment entirely unaddressed. The ALJ explained at step two: "regarding [Plaintiff's] right ear problems, [Plaintiff] underwent multiple procedures to correct the issue and retained intact overall hearing and word recognition." AR at 30. Plaintiff argues that this conclusion was "pure speculation" and insists that there is "no indication that [his] hearing loss has resolved itself." *Doc. 19* at 24.

Clearly, the ALJ offered limited discussion of Plaintiff's hearing impairment. Further, he only discussed Plaintiff's hearing impairment in the context of his step-two determination that the hearing impairment was not severe. At step four, the ALJ offered the more general assessment that Plaintiff's "impairments are not as limiting as he alleges." AR at 38. Notably, however, the ALJ supported his conclusion – that Plaintiff retained overall hearing and word recognition – with citations to various medical records addressing Plaintiff's hearing impairment and ear surgeries. AR at 30 (citing AR at 512, 519-22, 548, 868-83, 900, 915-18).

First, the ALJ referenced medical records from around the time of Plaintiff's alleged disability onset, in 2012 and 2013, which indicate that Plaintiff had hearing loss and chronic otitis media in his right ear. AR at 918-19. The ALJ also referenced more recent medical records, from 2015 to 2017, which demonstrate the following:

Kathleen A. Romero, Au.D., CCC-A, examined Plaintiff on January 9, 2015. AR at 512. According to Dr. Romero's report from that visit, an "[o]toscopy revealed red irritated tympanic membranes" and "[t]ympanometry yielded an abnormal immittance type 'B' tympanogram in the right ear." AR at 512. Additionally, Dr. Romero diagnosed

"severe mixed hearing loss in the right ear and a moderate conductive hearing loss in the left ear."[7] AR at 512. Despite these reports of hearing loss, Dr. Romero also reported that "[s]peech audiometry testing completed with a Spanish word test yielded a word recognition score (WRS) of 100% bilaterally." AR at 512. She recommended that Plaintiff follow up with an Ear Nose and Throat physician as soon as possible. AR at 512.

Alan Steven Brenner, M.D., examined Plaintiff on the same day as Dr. Romero. See AR at 513, 519-21. Dr. Brenner reported that Plaintiff developed hearing loss in childhood, had undergone left ear surgery nine months earlier, and had "difficulty hearing in both ears." AR at 519. Dr. Brenner's examination of Plaintiff's ears revealed that his right tympanic membrane was scarred and perforated and that his left tympanic membrane was scarred and possibly perforated. AR at 520. According to Dr. Brenner, Plaintiff was able to "hear and understand loud speech sounds." AR at 520. An [a]udiogram showed bilateral conductive hearing loss, worse in the right ear." AR at 520. Dr. Brenner diagnosed "severe ear damage bilaterally" and suggested Plaintiff consult with Kimberly Kinder, M.D., to determine whether there were any available surgical options. AR at 520-21.

Dr. Kinder examined Plaintiff a week later, on January 16, 2015. AR at 522. Plaintiff told Dr. Kinder that he had undergone bilateral ear surgery 10-15 years prior,

---

[7] Mixed hearing loss is a combination of conductive hearing loss and sensorineural hearing loss. Types of Hearing Loss, https://www.webmd.com/healthy-aging/types-hearing-loss#1 (last visited Mar. 30, 2020). While sensorineural hearing loss "comes from nerve damage in [the] inner ear" and is "usually permanent," conductive hearing loss is "a mechanical problem with [the] ear" in which "[s]ound has trouble moving from the outer ear to the eardrum and middle-ear bones," and "[m]edicine or surgery may help." *Id.*

sometime between 2000 and 2005, and revision surgery on his left ear sometime in approximately 2014. AR at 522. In Plaintiff's left ear, Dr. Kinder found an underlying tympanic membrane with abnormal contour but no visible perforation. AR at 522. In his right ear, she found a very small tympanic membrane remnant. AR at 522. She diagnosed mild to moderate conductive hearing loss and eustachian tube dysfunction in Plaintiff's left ear. AR at 522. She diagnosed conductive hearing loss with maximal air bone gap as well as chronic otitis media in his right ear. AR at 522. Dr. Kinder suggested that hearing aids might be a "viable option for hearing restoration," but Plaintiff expressed "concern[s] about cost." AR at 523. Although Dr. Kinder explained that any surgery she could perform was unlikely to help Plaintiff's right ear problems, she referred Plaintiff to Karl Horn, M.D. AR at 523.

On May 6, 2015, Dr. Horn performed a tympanoplasty and external ear canal reconstruction with tragal cartilage graft and removal of cholesteatoma in Plaintiff's right ear. AR at 548. He was unable to perform a planned reconstruction of Plaintiff's ossicular system due to cholesteatoma located in his middle ear. AR at 548. Nearly two years later, on February 8, 2017, Dr. Horn performed another surgery on Plaintiff's right ear. AR at 868. His records indicate that during the second surgery he performed an exploratory tympanotomy for the purpose of ruling out residual cholesteatoma as well as an ossicular reconstruction. AR at 869.

Plaintiff contends that the ALJ unreasonably inferred from these medical records that his hearing loss was completely resolved by ear surgeries. *Doc. 24* at 4. The Commissioner, on the other hand, insists that the records support the ALJ's analysis.

*Doc. 23* at 9. The Commissioner emphasizes that Plaintiff's "Spanish word list yielded a word recognition score (WRS) of 100% bilaterally." *Doc. 23* at 9 (citing AR at 512).

Without reweighing the evidence, the Court is satisfied that the ALJ's finding regarding Plaintiff's hearing impairment is supported by substantial evidence. The medical records cited by the ALJ confirm that Plaintiff underwent multiple procedures to address problems with his ears, including bilateral ear surgery sometime between 2000 and 2005, revision surgery on his left ear in approximately 2014, and additional surgeries on his right ear in 2015 and 2017. Even before Plaintiff's most recent ear surgeries, in 2015 and 2017, the record shows that he had a Spanish word recognition score of 100% in both ears. While there is some evidence suggesting Plaintiff experienced "mixed hearing loss" in his right ear in 2015 (*see* AR at 512), the bulk of the evidence of record indicates that he suffered from "conductive hearing loss," a problem with the mechanics of a the ears for which successful surgical intervention is more likely (*see* Types of Hearing Loss, https://www.webmd.com/healthy-aging/types-hearing-loss#1 (last visited Mar. 30, 2020)).

Plaintiff does not point to any evidence showing that he ever received a word recognition score of less than 100% at any time. Indeed, beyond complaining that "with [his] two ears [he] can't hear very well," Plaintiff does not identify any records demonstrating that hearing loss caused specific communicative problems. His medical records do not reveal significant difficulties communicating with medical providers due to a hearing impairment, and the transcript of the administrative hearing does not suggest that Plaintiff had difficulty hearing the ALJ or communicating with him through the interpreter. The evidence relied upon by Plaintiff – his own testimony that he "can't

hear very well" – does not overwhelm the evidence upon which the ALJ relies, particularly given the ALJ's finding that Plaintiff's own statements are not entirely consistent with the evidence of record. AR at 34. Plaintiff has failed to put forward evidence establishing work-related limitations as a result of his hearing impairment, and the ALJ's determination that Plaintiff's hearing and word recognition remained intact are supported by substantial evidence.

Plaintiff also argues that even if he had normal word recognition in a doctor's office, it remains unclear that he would be capable of performing two of the jobs identified by the vocational expert. *Docs. 19* at 24; *24* at 4. He argues that the Bakery Helper and Bottle Line Attendant jobs require work in moderately noisy to loud environments. *Docs. 19* at 24; *24* at 4. Plaintiff attaches to his brief the "Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles," which shows that the noise intensity level is "Moderate" for the Bakery Helper job and "Loud" for the Bottle Line Attendant job. *See Doc. 19*, Ex. 1. But critically, Plaintiff does not identify any evidence demonstrating that his specific hearing impairment would prevent him from performing a job in either category of noise intensity level. None of the medical sources offered an opinion to this effect. The Court will deny Plaintiff's motion with respect to his second issue.

C.    **The ALJ adequately discussed Plaintiff's obesity, and Plaintiff has failed to identify evidence showing additional limitations related to obesity.**

Plaintiff argues that the ALJ did not meaningfully explain how he incorporated the impact of obesity into the RFC. *Doc. 19* at 24. At step two, the ALJ characterized Plaintiff's obesity as a severe impairment. AR at 30. Then, at step three, he explained

that while there is no specific medical listing regarding obesity, he had evaluated Plaintiff's obesity pursuant to SSR 02-1p, which provides as follows:

> [W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

AR at 31 (quoting SSR 02-1p, 2002 WL 34686281, at *1 (Sept. 12, 2002)). Yet, Plaintiff argues that the ALJ failed to determine whether Plaintiff's obesity satisfied any Listing. *Doc. 19* at 25.

The ALJ stated that he had "fully considered [Plaintiff's] obesity in the context of the overall record evidence in making [his] decision." AR at 31. Given the context of this statement, it is clear that "the decision" to which the ALJ referred was his determination that none of Plaintiff's impairments, singly or in combination, met or medically equaled the severity of one of the listed impairments. AR at 30. Thus, at minimum, the ALJ implicitly determined that obesity, even when combined with other impairments, did not meet any Listing. Plaintiff has not shown any reversible error as to the ALJ's treatment of his obesity impairment at step three of the sequential evaluation process.

Further, the ALJ addressed Plaintiff's obesity again at step four. AR at 36. He acknowledged that Plaintiff maintained a body mass index score over 30 during the relevant period. AR at 36 (citing AR at 976). And, again, he referred to SSR 02-1p, explaining that the ruling "recognizes that obesity can cause limitation of function and that the combined effects of obesity with other impairments may be greater than might be expected without obesity." AR at 36 (citing SSR 02-1p). Finally, he indicated that he had "fully considered" Plaintiff's obesity in reaching his determination that he could

perform light work with additional postural limitations. AR at 36. Even so, Plaintiff faults the ALJ for not specifying which impairments were aggravated by obesity. *Doc. 19* at 25.

Plaintiff notes that the physicians treating him for pain counseled him multiple times to engage in "weight management" and insists that it follows from this advice that his obesity contributes to the severity and treatment of his pain. *Doc. 19* at 25. Additionally, Plaintiff submits that his severe knee and back problems were likely aggravated by his obesity. *Id.* The Commissioner counters, suggesting that Plaintiff's arguments "elevate form over substance" and maintaining that the ALJ adequately accounted for Plaintiff's obesity in his RFC determination. *Id.* at 10-11.

To some extent, the Court agrees with both parties. First, the Court agrees with Plaintiff that his obesity likely contributes to the severity of his pain and aggravates his knee and back impairments. At the same time, the Court also agrees with the Commissioner that the ALJ adequately accounted for Plaintiff's obesity because the "ramifications of obesity are subsumed within the [ALJ's] discussion of [Plaintiff's] other medical conditions." *Doc. 23* at 10 (citing *Razo v. Colvin*, 663 F. App'x 710, 716-17 (10th Cir. 2016)).

Plaintiff argues that *Razo* is distinguishable because the ALJ there "actually discussed" the plaintiff's obesity. *Doc. 24* at 5. The Tenth Circuit in *Razo* explained:

> The ALJ observed that none of the medical opinions specifically addressed the impact of Mr. Razo's obesity on his other impairments. Nevertheless, the ALJ stated, Mr. Razo's obesity would have been obvious to all of the medical sources, who would be expected to include the effects of obesity in the limitations indicated. The ramifications of obesity are subsumed within the discussion of Mr. Razo's other medical conditions. Furthermore, Mr. Razo does not discuss or cite to medical or other evidence to support his

claim that his obesity was disabling. Therefore, we conclude that the factual record does not support Mr. Razo's claim that the ALJ failed to consider the effect of his obesity, either alone or in combination with other impairments in the RFC assessment.

*Razo*, 663 F. App'x at 716-17 (internal citations omitted). Plaintiff maintains that the ALJ's discussion of obesity here, in contrast to the ALJ's discussion in *Razo*, "nowhere cites any facts specific to the case." *Doc. 24* at 5. But this characterization is not entirely accurate. The ALJ observed that Plaintiff's body mass index was over 30. AR at 36. The ALJ also referenced a September 2017 medical record, which detailed Plaintiff's height, weight, and corresponding body mass index and categorized him as "obese."[8] AR at 36 (citing AR at 976). And immediately after explaining Plaintiff's RFC determination, the ALJ followed up with the statement that he had "specifically note[d] [Plaintiff's] obesity and its effect on this [RFC] determination." AR at 36.

Beyond his obesity-specific discussion, the ALJ also devoted significant discussion to medical records addressing impairments which Plaintiff's obesity logically aggravates, including his knee and back impairments. *See* AR at 34-35. The ALJ's discussion includes various evaluations of Plaintiff's pain, gait, strength, and movement, which Plaintiff's obesity impacts. *See* AR at 34-35. The ALJ summarized Plaintiff's medical history, specifically noting his history of obesity, and observed that Plaintiff was frequently able to ambulate independently, had a sporadic gait impairment, and retained strength and movement in three of his extremities. AR at 35. In light of all of these

---

[8] In addition to discussing Plaintiff's body mass index, this referenced medical record also included a comprehensive evaluation of Plaintiff's other impairments, including his chronic low back pain, right knee pain, right ankle pain, and depression. *See* AR at 964-86.

findings by the ALJ, the Court is satisfied that he adequately addressed the ramifications of Plaintiff's obesity in reaching this RFC determination.

Critically, Plaintiff does not discuss nor cite any evidence that would support a finding that his obesity contributes to limitations beyond those included in the RFC. *See Arles v. Astrue*, 438 F. App'x 735, 740 (10th Cir. 2011) (finding that the plaintiff did "not discuss or cite to any evidence showing that obesity further limited his ability to perform a restricted range of sedentary work"); *Rose v. Colvin*, 634 F. App'x 632, 637 (10th Cir. 2015) (noting that the plaintiff pointed "to no medical evidence indicating that her obesity resulted in functional limitations"). The ALJ found Plaintiff capable of performing light work but limited him to standing, walking and/or sitting for six hours in an eight-hour workday; determined that he could only *occasionally* balance, stoop, kneel, crouch, crawl, or climb ramps or stairs; and found that he could *never* climb ladders, ropes, or scaffolds. *See* AR at 33. As the Commissioner emphasizes, Plaintiff did not testify that his obesity caused any further limitations. *See* AR at 57. Moreover, Plaintiff's disability application did not identify obesity as an impairment that limited his ability to work. *See* AR at 319. Simply, Plaintiff has failed to demonstrate that the limitations included in his RFC fail to adequately account for his obesity. *See Rose*, 634 F. App'x at 637 (finding no reversible error where the ALJ did not discuss obesity in assessing the plaintiff's RFC, because the plaintiff did not point to any "medical evidence indicating that her obesity resulted in functional limitations" and because "her hearing testimony did not describe limitations due to obesity"). As such, the Court concludes that the ALJ's treatment of Plaintiff's obesity does not warrant remand. The Court will deny Plaintiff's motion as to his third claim of error.

**D.     The ALJ gave good reasons, supported by the record, for discounting Plaintiff's subjective complaints.**

Finally, Plaintiff challenges the ALJ's consideration of his subjective complaints. He argues that the ALJ should have "consider[ed his] good work history to bolster his credibility." *Doc. 19* at 25.  He also faults the ALJ for considering his English language proficiency and positive Waddell signs. *Id.* at 25-26.

In determining an RFC, an ALJ must consider the entire record, including the claimant's subjective complaints. SSR 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017). Pursuant to 20 C.F.R. §§ 404.1529(a) and 416.929(a), the ALJ is tasked with considering all of the claimant's symptoms and the "extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."

Here, the ALJ acknowledged that Plaintiff reported "chronic pain in his back and knee, as well as difficulty with sitting, standing, walking, lifting, bending, kneeling, squatting, climbing, reaching, memory, concentration, finishing tasks, getting along with others, and performing activities of daily living." AR at 33 (citing AR at 337-39, 343-47, 377). Additionally, the ALJ recounted Plaintiff's testimony that "he used a cane for ambulation; could not stoop, kneel, or crawl; . . . could only lift five pounds, sit for ten minutes, and stand for three minutes at a time[; and experienced] poor moods, crying spells, and social avoidance." AR at 34. Yet, as noted above, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." AR at 34. He offered at least four reasons for this finding.

First, the ALJ found Plaintiff's subjective complaints inconsistent with the objective medical evidence. He concluded that Plaintiff's reported limitations in his ability to lift, sit, and stand were "rebutted by his frequent demonstrations of intact movement, strength, and sensation of his upper extremities and lower left extremity" in his medical records. AR at 37. Likewise, the ALJ found that Plaintiff's right lower extremity also "showed some improvement to strength and range of motion following his right knee replacement." AR at 37.

Second, the ALJ noted that Plaintiff exhibited three out of five positive Waddell signs, which "suggested possible symptom exaggeration." AR at 37 (citing AR at 433-59, 921-92). In support, the ALJ cited records from an Independent Medical Evaluation performed by Juliana Garcia, D.O. on June 13, 2013 (AR at 37 (citing AR 433-59)), as well as those from a Panel Independent Medical Evaluation performed by Juliana Garcia, D.O., Andrew Paterson, M.D., and Daniel Wascher, M.D., on September 8, 2017 through September 11, 2017 (AR at 37 (citing AR at 964-86)). Both sets of records indicate that Plaintiff demonstrated three of five positive Waddell signs, which, as the records explain, "is considered significant for evidence of symptom magnification or possible illness behavior." AR at 453, 977.

Third, the ALJ reasoned that Plaintiff's testimony that he could only read, write, and communicate in Spanish was undermined by his responses to some questions at the administrative hearing before they were translated by the Spanish interpreter, by his conversation with his representative in English at the hearing, and by indications in various treatment notes that he had some ability to communicate in English. AR at 37 (citing AR at 662, 899).

Finally, the ALJ determined that certain of Plaintiff's activities of daily living contradicted his subjective complaints. Specifically, he noted that Plaintiff reported being capable of maintaining his own personal care, helping to clean the house, preparing simple meals, folding laundry, watering plants, caring for pets, maintaining his finances, driving a car, running errands, and shopping for groceries. AR at 37 (citing 343-47, 886-87, 908-09). According to the ALJ, "[t]hese admitted activities of daily living . . . directly contradict [Plaintiff's] allegation that he can no longer sustain a full work schedule" at the light exertional level. AR at 37.

Of these reasons, Plaintiff takes issue with only two: his demonstration of English language skills and his positive Waddell signs. As for his ability to communicate in English, Plaintiff argues that it was inappropriate for the ALJ to consider his English proficiency, given that "it is not at all uncommon in New Mexico for a legal immigrant laborer to have some knowledge of conversational English while still truthfully identifying as a non-English speaker." *Doc. 19* at 25. The Court does not agree that it was inappropriate for the ALJ to mention Plaintiff's language skills. Although the ability to communicate in English is not a specific factor listed for consideration in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3),[9] it *is* an explicit vocational factor relevant to an

---

[9] Pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), ALJs should consider the following factors relevant to the intensity and persistence of a claimant's symptoms:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

ALJ's step-five finding, *see* 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).[10] Here, the

ALJ's finding that Plaintiff understated his English proficiency was fair and supported by

substantial evidence. Plaintiff demonstrated significant English skills at the hearing. *See*

AR at 72. Further, notations in his medical records suggest he had some ability to

communicate with medical providers in English. *See* AR at 629, 631, 638 (indicating

that Plaintiff's language was "English"), 662 (acknowledging that Plaintiff's primary

language is Spanish, but describing him nevertheless as "understandable"), 899

(indicating that Plaintiff is "primarily Spanish speaking, though he does have some

English"). Simply put, the ALJ did not err when he noted contradictions between

Plaintiff's testimony about his English skills and the English skills demonstrated at the

hearing and in the medical records.

With regard to Plaintiff's demonstration of Waddell signs, Plaintiff argues that the

ALJ failed to consider Dr. Davis's opinion that he suffers from a high degree of focus on

somatic symptoms and catastrophic thoughts regarding pain. *Doc. 19* at 25. As

---

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

[10] 20 C.F.R. §§ 404.1564(b)(5) and 416.964(b)(5) explain that language skills are considered by an ALJ in conjunction with a claimant's education. These regulations provide:

Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor. Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in.

20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).

explained above, the Court is satisfied that the ALJ adequately considered Dr. Davis's report and the opinions therein. *See supra* Part IV(A). Plaintiff goes further here, however, arguing that it follows from Dr. Davis's opinions that his Waddell's signs "were possibly the result of a mental impairment and do not indicate exaggeration." *Doc. 19* at 25. To support this rationale, Plaintiff submits a journal article entitled, "A structured evidence-based review on the meaning of nonorganic physical signs: Waddell signs." *See Doc. 19*, Ex. 2. In the article, the author concludes, in part, that Waddell signs "do not discriminate organic from nonorganic problems," "may represent an organic phenomenon;" "are associated with greater pain levels;" and "are not associated with secondary gain." *See id.* While the article could potentially support a conclusion that positive Waddell signs are sometimes indicative of mental impairment, it is simply irrelevant to the analysis here. Plaintiff does not suggest that the article was considered by the ALJ or by any of his medical providers, including Dr. Davis. The relevant question here before the Court is whether the ALJ's findings are supported by substantial evidence in the record and clear of legal error, not whether there could possibly be a contrary finding. *See Lax*, 489 F.3d at 1084 ("The possibility of drawing two inconsistent conclusions does not prevent [the] findings from being supported by substantial evidence."). The Independent Medical Evaluations referenced by the ALJ explain that Waddell signs "are a group of physical signs utilized to determine if symptom magnification is present." AR at 977. These evaluations also indicate that the three out of five positive Waddell signs shown by Plaintiff here are indicative of symptom magnification. *See* AR at 453, 977. Even if it was possible to reach a contrary conclusion, as Plaintiff suggests, the ALJ's interpretation of the Waddell signs remains

supported by substantial evidence and is therefore entitled to deference. *See Lax*, 489 F.3d at 1084.

Additionally, Plaintiff insists that the ALJ should have found that his certified earnings record demonstrated a pattern of continuous work and earnings from 1989 through the end of 2008. *Doc. 19* at 25. Quoting *Tyson v. Apfel*, 107 F. Supp. 2d 1267, 1270-71 (D. Colo. 2000), Plaintiff contends that "[w]here a claimant has a good work history, [he] is entitled to substantial credibility when [he] then asserts that [he] is unable to work." *Doc. 27* at 7. *Tyson* is easily distinguishable, however. There, the ALJ found the plaintiff "not entirely credible," but the District of Colorado disagreed, finding that there was "[a]bsolutely nothing in the record to support this finding. All evidence [was] to the contrary." *Tyson*, 107 F. Supp. at 1268. The ALJ in *Tyson* determined that the plaintiff's medical records did not support her allegations of pain, but the court found that the ALJ failed to articulate any such inconsistencies. *Id.* at 1270. The court concluded that the ALJ "selected insignificant factors to discount [the plaintiff's] credibility" and also ignored evidence that supported the plaintiff's credibility, including her excellent work history. *Id.* at 1270.

While work history is admittedly a factor that an ALJ may consider in assessing a claimant's subjective complaints, the Tenth Circuit has clarified that ALJs are not obligated to "make a formalistic factor-by-factor recitation of the evidence." *See Keyes-Zachary*, 695 F.3d at 1167. Unlike the ALJ in *Tyson*, the ALJ here offered a number of valid reasons for reaching the conclusion that Plaintiff's subjective complaints were not entirely consistent with the record. And, notably, Plaintiff does not take issue with the ALJ's determination that his subjective complaints were inconsistent with the objective

medical evidence and with his activities of daily living. Moreover, all of the ALJ's findings

in this regard are supported by substantial evidence, as is his ultimate decision that

Plaintiff's subjective complaints are inconsistent with the evidence of record. The Court

will deny Plaintiff's motion as to his final claim of error.

## V.     Conclusion

For all of the reasons above, Plaintiff has failed to demonstrate that the ALJ's

findings were not supported by substantial evidence or that he failed to apply the correct

legal standards.

Wherefore,

**IT IS ORDERED** that Plaintiff's Motion to Reverse and/or Remand (*Doc. 19*) is

**denied**. A final order pursuant to Rule 58 of the Federal Rules of Civil Procedure will

enter concurrently herewith.

_____

UNITED STATES MAGISTRATE JUDGE
Presiding by Consent